IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| A.H., a minor, by and through her grandmother, ] | |
| ] | |
| Plaintiff, ] | |
| ] | |
| v. ] | 2:18-cv-02081-ACA |
| ] | |
| JACKSON-OLIN HIGH SCHOOL, et al., ] | |
| ] | |
| Defendants. ] | |

# MEMORANDUM OPINION AND ORDER

Before the court is Defendant Birmingham Board of Education's ("the Board") motion for summary judgment. (Doc. 42).

On November 1, 2017, a ninth grade special needs student at Jackson-Olin High School was sexually assaulted in a locker room by multiple male students. Through her grandmother, that student, whom the court will call A.H. to protect her identity, filed suit against the Board, asserting that the Board discriminated against her in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, by being deliberately indifferent to her needs, failing to protect her, and failing to make accommodations for her disability.[1] (Doc. 12 at 8–10).

---

[1] A.H. asserted other claims, but the court has dismissed them. (*See* Doc. 22).

The facts of this case are egregious but although other federal statutes may have provided A.H. the relief she seeks (*see* doc. 22 at 8–9), the statute under which she proceeds does not. Therefore, the court **GRANTS** the Board's motion for summary judgment because although A.H. has presented evidence from which a reasonable jury could find that the Board was deliberately indifferent, she has not presented evidence from which that jury could find that the deliberate indifference was because of her disability.

I.   **BACKGROUND**

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

In 2017, A.H. began ninth grade as a special education student at Jackson-Olin High School. (Doc. 43-1 at 4, 7; Doc. 43-4 at 7–8). At the time, she functioned academically at around a second grade level. (Doc. 43-4 at 1; *see also* Doc. 43-3 at 31). Under the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, A.H. had an "Individualized Education Plan" ("IEP") which allowed her to "participate in non-academic and extracurricular activities with her peers with supervision of the teacher and/or paraprofessionals." (Doc. 43-4 at 3). Her special education teacher was Rennette Dotson. (Doc. 43-1 at 4; Doc. 43-3 at 7). She was

scheduled to be in a self-contained classroom with Ms. Dotson for five out of her seven classes, but she did take two classes in other classrooms. (Doc. 43-4 at 12, 15). One of those classes was health, taught by Coach Howard Ross. (Doc. 43-8 at 17).

About a month[2] after A.H. began her ninth grade year at Jackson-Olin High School, she was in physical education class when an unidentified male student came and told the teacher that Ms. Dotson wanted to see A.H.[3] (Doc. 43-1 at 17, 19). The teacher sent A.H. out with the male student, who took A.H. to Ms. Dotson. (*Id.* at 17, 20). Ms. Dotson, saying that she had not asked to see A.H., sent A.H. back to her class. (*Id.* at 20). Two class periods later, A.H. was in health class with Coach Ross when the same male student came to A.H.'s classroom and again said that Ms. Dotson wanted to see her. (*Id.* at 20–21). Coach Ross sent A.H. out with the male student, who took A.H. to an empty classroom and raped her. (*Id.* at 21–22).

After the male student left, A.H. returned to her classroom and told Coach Ross about the rape. (Doc. 43-1 at 22). He responded that he would not allow that student to come into his classroom again. (*Id.*). A.H. then told Ms. Dotson and a

---

[2] A.H., who exhibited some confusion about dates in general, was not sure exactly when this incident occurred, but finally testified that it was mid-September. (*See* Doc. 43-1 at 18–19).

[3] The Board contends that A.H.'s account of the first sexual assault is implausible because of her uncertainty about dates and confusion about which class she was in. (Doc. 44 at 25–30). Whether A.H.'s testimony is implausible or incredible is not for the court to decide at this stage. The court will, in compliance with the summary judgment standard, accept A.H.'s testimony as true.

3

Birmingham Police Department officer who worked as a school resource officer, who were already aware of the situation.[4] (*Id.*; *see* Doc. 43-7 at 5 n.11). A.H. identified the male student in the hallway, and he denied having done anything to A.H. (Doc. 43-1 at 22). They let the male student go. (*Id.* at 22–23).

The next day, A.H. and Ms. Dotson heard the male student bragging in the lunchroom about having sex with A.H. (Doc. 43-1 at 23). Ms. Dotson took A.H. out of the lunchroom, but A.H. was not aware of whether the school ever took any disciplinary action against the male student. (*Id.*). A.H. testified that she did not tell her grandmother, who is her guardian, about the incident because she assumed someone from the school did. (*Id.*; *see* Doc. 43-2 at 2).

On November 1, 2017, A.H. was again in health class, still taught by Coach Ross. (Doc. 43-8 at 39). That day, he decided to take his students to the gymnasium. (*Id.* at 20). At some point, he left the gym to check on whether any students were outside skipping class. (*Id.* at 83, 90). While he was out of the gymnasium, A.H. went to the girls' locker room. (Doc. 43-1 at 7, 9; Doc. 43-8 at 90).

While A.H. was in a bathroom stall, four male students entered the locker room and "busted in the stall." (Doc. 43-1 at 7–8). They forced her to perform oral sex on them while one of them recorded her on his phone. (*Id.* at 8). After the male students were done, some other students entered the room and one student asked

---

[4] Ms. Dotson denies that A.H. reported this sexual assault. (*See* Doc. 43-3 at 33).

4

A.H. what had happened.  (*Id.* at 9–10).  The student then reported the events to a coach.  (Doc. 43-1 at 10; Doc. 43-3 at 17, 19; Doc. 43-8 at 39–40).  That coach detained the male students who were still in the locker room and brought them to another coach, who reported the incident to assistant principal John Plump.  (Doc. 43-7 at 2).

The next day, A.H. told Ms. Dotson about the assault.[5]  (Doc. 43-4 at 19).  Ms. Dotson had already heard about it and took A.H. to a conference room where Dr. Plump and Mr. Willis were interviewing the male students.  (Doc. 43-1 at 11–12; Doc. 43-3 at 21; Doc. 43-7 at 2).  A.H. and Ms. Dotson stayed in the conference room for about half an hour before they became upset and left.  (Doc. 43-3 at 22).  At some point later that day, Mr. Willis and Dr. Plump called them back into the conference room, at which time A.H. identified the male students as the ones who had assaulted her in the locker room.  (*Id.*; *see also* Doc. 43-1 at 12).

After this meeting, Ms. Dotson called A.H.'s grandmother.[6]  (Doc. 43-2 at 5).  A.H.'s grandmother went to the school and met with the principal, Dr. Plump,

---

[5] A.H. actually testified that she told Ms. Dotson what happened immediately after the assault. (Doc. 43-1 at 11).  She appears to have mixed up the events of November 1 and November 2, as she also testified that she and Ms. Dotson went directly to a conference room where the four male students were being interviewed, and after that interview, she went to her next class. (*Id.* at 11–13).  However, her health class with Coach Ross was the last class period of the day. (*See id.* at 20).  Even if A.H. had told Ms. Dotson about the assault on the day it occurred, however, it would not change this court's analysis.

[6] Ms. Dotson testified that she called A.H.'s grandmother in the afternoon of November 1 to tell her about the assault.  (Doc. 43-3 at 19).  Because the parties dispute this fact, the court must accept the version in favor of A.H. for summary judgment purposes.

Mr. Willis, Ms. Dotson, and a school resource officer. (Doc. 43-2 at 5; *see* Doc. 43-7 at 5 n.11). They told her that an officer with the Birmingham Police Department would coordinate an examination of A.H. (Doc. 43-2 at 6). After the meeting, as A.H., her grandmother, and Ms. Dotson were standing in the hallway, one of the boys who had assaulted A.H. walked by, upsetting A.H. (Doc. 43-3 at 23). A.H.'s grandmother took her home from the school immediately. (Doc. 43-2 at 6).

The four boys who assaulted A.H. were eventually suspended. (Doc. 43-4 at 24). The school also cited A.H. and sought to suspend her for a violation of the school's Code of Conduct. (Doc. 43-7 at 5; *see also* Doc. 43-3 at 24–25; Doc. 43-4 at 11). Under the IDEA, any decision to change the placement of a child with a disability based on a violation of a code of conduct requires the IEP team to hold a "manifestation determination" meeting to determine if the child's disability caused or had "a direct and substantial relationship to" the conduct or if conduct was the direct result of the educational agency's failure to implement the IEP. 20 U.S.C. § 1415(k)(1)(E)(i). Although Ms. Dotson was resistant to the idea of disciplining the victim of the sexual assault, at the insistence of her superiors, she called A.H.'s grandmother and informed her that A.H. had been cited and that the IEP team needed to do a "manifestation determination." (Doc. 43-4 at 11; Doc. 43-2 at 7).

A.H.'s grandmother refused to have any part of either a disciplinary hearing or a manifestation determination. (Doc. 43-2 at 7). Despite Ms. Dotson's confusion

6

about what behavior by A.H. prompted the need for a manifestation determination, she and Mr. Willis held the meeting themselves and, according to Ms. Dotson's notes, "determined that the behavior (being violated ????) was a manifestation of her disability and that an IEP meeting would be held to address her transition" to a behavioral intervention plan. (Doc. 43-4 at 11; *see also* Doc. 43-4 at 32–33).

As the school was working on revising A.H.'s IEP, A.H.'s grandmother, frustrated with the slow progress in getting A.H. tested, took A.H. to a pediatrician, who discovered that A.H. had a sexually transmitted disease that, to the doctor's knowledge, she could not have contracted from oral sex. (Doc. 43-2 at 3, 7, 9; Doc. 43-5 at 8). Based on this information, A.H.'s grandmother asked A.H.'s older sister to talk to A.H. and eventually learned about the September rape. (Doc. 43-2 at 9).

A.H.'s grandmother decided not to send her back to Jackson-Olin High School, and instead began homeschooling her while looking for a transfer to another school. (Doc. 43-2 at 7–8; *see also* Doc. 43-1 at 15–16). A.H. eventually transferred to a different high school at the start of her tenth grade year. (Doc. 43-1 at 4; Doc. 43-2 at 8–9).

## II. DISCUSSION

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

*see also Hamilton v. Southland Christian Sch.*, 680 F.3d 1316, 1318 (11th Cir. 2012). "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

A.H.'s only remaining claim is that the Board violated the ADA. (Docs. 12, 22). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a violation of Title II of the ADA, A.H. must show "(1) that [she] is a qualified individual with a disability; (2) that [she] was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017).

To obtain damages for a violation of the ADA, "a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of deliberate indifference." *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019). Under that standard, "a plaintiff must show that the defendant knew that harm to a federally

protected right was substantially likely and failed to act on that likelihood." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (quotation marks and emphasis omitted).

The Board's arguments in support of summary judgment are that (1) a single incident of sexual assault is insufficient to put the Board on notice of any risk to A.H. (doc. 44 at 22–25; doc. 52 at 11–12); (2) A.H. has not proved that the September rape actually happened or that the Board was on notice of that rape (*id.* at 25–31; doc. 52 at 9–10); (3) even if A.H. had proved that the September rape happened, the two sexual assaults are not similar enough to have put the Board on notice (doc. 44 at 30–31); and (4) A.H. has not proved that her disability caused any deliberate indifference on the Board's part (doc. 52 at 10–11 & n.16).

The Board's first three arguments fail because those arguments would require the court to discredit A.H.'s testimony. A.H. testified that she was raped in September 2017 during her eighth period health class taught by Coach Ross, at most weeks before the November 1, 2017 assault, which also occurred during her eighth period health class with Coach Ross. (Doc. 43-1 at 7–8, 18–22). Moreover, she testified that she informed Coach Ross, Ms. Dotson, and a school resources officer about the September rape. (*Id.* at 22). A reasonable jury could find that the two sexual assaults on A.H., committed within weeks of each other, during the same

class period while under the supervision of the same teacher, put the Board on notice of the need to supervise A.H. more closely.

The Board states in passing that Coach Ross and Ms. Dotson are not Board officials whose awareness of the rape would put the Board on notice (doc. 52 at 9–10), but that argument made in passing for the first time in a reply brief is not sufficient to allow a ruling on that question, *see United States v.* Evans, 473 F.3d 1115, 1120 (11th Cir. 2006) ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court."). The Eleventh Circuit has held that, in the right circumstances, a schoolteacher can be "an appropriate person with authority to take corrective measures so as to constitute an official decision from the school district itself." *J.S., III, by & through J.S. Jr.*, 877 F.3d at 989. This court declines to take up the question whether those circumstances are present here without more thorough argument from the Board on the issue.

However, the Board's final argument fares better than its first three. The Board contends that A.H. has not presented evidence showing that her disability caused the Board's deliberate indifference. (Doc. 44 at 33; Doc. 52 at 10–11 n.16). Because the court found that the Board's argument was not very clearly presented in its initial brief, the court ordered a sur-reply on the causation question. (Doc. 53). In that sur-reply, among other arguments non-responsive to the order, A.H. argues that the violation of the IEP and the existence of the manifestation determination

suffice to establish that A.H.'s disability caused the Board's deliberate indifference. (Doc. 54 at 4–5).

One of the vital elements of an ADA claim is a demonstration "that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *J.S., III by & through J.S. Jr.*, 877 F.3d at 985. Here, A.H. has clearly presented evidence that, if believed by a jury, would establish that the Board's employees failed to adequately supervise A.H., especially in light of their knowledge of the first sexual assault in September. But she has not presented any evidence that her disability caused that failure.

A.H.'s arguments fail for several reasons. For one thing, it is not clear that anyone at the school violated A.H.'s IEP, as it required supervision during "non-academic and extracurricular activities with her peers." (Doc. 43-4 at 3). But both sexual assaults occurred during class time, not non-academic or extracurricular activities. And Ms. Dotson testified that all classes were supposed to be supervised. (*Id.* at 12). Thus, although A.H. was not properly supervised, that failure was not necessarily a violation of the IEP, but instead was a failure of the general duty to supervise all students—regardless of ability—during class time.

For another thing, although a violation of an IEP can be evidence of disability-based discrimination, it is not, as a matter of law, *per se* evidence of disability-based discrimination. *See J.S., III by & through J.S. Jr.*, 877 F.3d at 985–86 (discussing

11

the differences and overlap between the ADA, the Rehabilitation Act, and the Individuals with Disabilities Education Act). In the *J.S.* case, the violation of the IEP—repeated removal of the plaintiff from his assigned classrooms despite instructions not to do so—was evidence of disability-based discrimination because it "implicate[d] those further, intangible consequences of discrimination . . . that could result from isolation, such as stigmatization and deprivation of opportunities for enriching interaction with fellow students." 877 F.3d at 987.

Even assuming that the failure to properly supervise A.H. during class time was a violation of the IEP instead of the school's general duty to supervise all students, that violation of the IEP would not establish disability-based discriminatory intent. Unlike the *J.S.* case, the purported violation of the IEP here did not implicate any of the concerns underscoring the ADA, such as preventing (1) the unwarranted assumption that people with disabilities are "incapable or unworthy of participating in community life," and (2) the diminishment of their everyday life activities. *See J.S., III, by & through J.S., Jr.*, 877 F.3d at 986–87 (quoting *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600–01 (1999)).

A.H. also argues that the manifestation determination shows that the Board's deliberate indifference arose from her disability. (Doc. 54 at 5). However, even taking the evidence in the light most favorable to A.H., it shows that the IEP team held the manifestation determination in order to prevent the imposition of any

discipline on A.H., and under protest by Ms. Dotson. (*See* Doc. 43-4 at 11; Doc. 43-2 at 7; Doc. 43-4 at 32–33). Moreover, while the decision to cite A.H. for a sexual assault perpetrated on her is reprehensible, A.H. has not explained how that decision arose from her disability as opposed to any other reason, discriminatory or non-discriminatory.

Protecting students from sexual assault is important, and what happened to A.H. inexcusable. The actions of the Board in this case were shameful. Taking the facts in the light most favorable to A.H., the Board did not adequately protect her, nor did it treat her with the sensitivity that her experiences called for. But A.H. has not argued or shown how those failures are related to her disability, which is a critical part of a claim under the ADA. Because A.H. has not presented evidence from which a reasonable jury could find that the Board's deliberate indifference "was by reason of [her] disability," *J.S., III by & through J.S. Jr.*, 877 F.3d at 985, the court must grant summary judgment in favor of the Board.

Accordingly, the court **GRANTS** the motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of the Board and against A.H. on her ADA claim. The court will enter a separate final judgment consistent with this opinion.

**DONE** and **ORDERED** this May 4, 2020.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE

14